UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TORRANCE JACKSON,

                              Plaintiff,

                                                  5:20-CV-1215
v.                                         (GTS/ML)

POLICE OFFICER ANTHONY FIORINI,

                              Defendant.

_____

APPEARANCES:                              OF COUNSEL:

THE LAW OFFICE OF FRED LICHTMACHER P.C.    FRED B. LICHTMACHER, ESQ.
   Counsel for Plaintiff
116 West 23rd Street, Suite 500
New York, NY 10011

CITY OF SYRACUSE LAW DEPARTMENT       TODD M. LONG, ESQ.
   Counsel for Defendants                    Senior Assistant Corp. Counsel
233 East Washington Street
300 City Hall
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      Currently before the Court, in this civil rights action filed by Torrance Jackson

("Plaintiff") against Police Officer Anthony Fiorini ("Defendant") pursuant to the Fourth and

Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, is Defendant's

motion for summary judgment pursuant to Fed. R. Civ. P. 56.   (Dkt. No. 73.)   For the reasons

set forth below, Defendant's motion for summary judgment is granted and Plaintiff's Complaint

is dismissed.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Complaint

Generally, in his Complaint, Plaintiff asserts two claims against Defendant.   (Dkt. No. 1.)   First, Plaintiff claims that Defendant used excessive and unnecessary force against him in violation of the Fourth and Fourteenth Amendments of the United States Constitution by physically abusing him, punching him, pepper spraying him, involuntarily restraining him in the hospital, and subjecting him to a colonoscopy procedure without his consent ("First Claim"). (*Id.* at ¶¶ 38-45.)

Second, Plaintiff claims that Defendant violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution by failing to intervene in the above-discussed use of excessive force ("Second Claim").   (*Id.* at ¶¶ 46-50.)

### B.     Procedural History

On December 18, 2020, the five original Defendants in this action[1] filed a motion for judgment on the pleadings.   (Dkt. No. 13.)   On August 20, 2021, the Court granted that motion in part and denied it in part, dismissing the claims against the City of Syracuse[2] and Officers Abraham, Kittle, and Proccopio, as well as the claim against Defendant Fiorini for failure to intervene in the alleged use of excessive force while at the hospital, while leaving undisturbed the First Claim against Defendant Fiorini arising from the excessive force used both during the traffic stop and at the hospital, and the Second Claim against Defendant Fiorini arising from a

---

[1]     The four other original Defendants in this action were Syracuse City Police Officer Mamoun Abraham, Syracuse City Police Officer William Kittle, Syracuse Police Lieutenant David Proccopio, and the City of Syracuse.   (Dkt. No. 1, at ¶¶ 4, 6.)

[2]     In addition to the claims described above, Plaintiff's Complaint asserted a claim that Defendant City of Syracuse should be held liable for the violations of his rights through the above actions on the basis that it was aware of the Syracuse Police Department's propensity to commit unconstitutional acts but acted with deliberate indifference to that knowledge ("Third Claim").   (Dkt. No. 1, at ¶¶ 51-65.)

2

failure to intervene as it relates to the traffic stop.   (Dkt. No. 19.)

On January 24, 2022, Plaintiff filed a motion to amend or correct the Complaint, but on February 23, 2022, United States Magistrate Judge Miroslav Lovric denied that motion without prejudice.   (Dkt. No. 35.)   Plaintiff never renewed that motion.   (*See generally* Docket Sheet.)

### C.     Undisputed Material Facts on Defendant's Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported

3

by record citations by Defendant, and either expressly admitted or denied without a supporting

record citation by Plaintiff.

### Initial Traffic Stop

1.      On October 16, 2017, at approximately 12:34 PM, Defendant, Officer Abraham,

and Investigator Christopher Reidy from the New York State Attorney General's Office initiated

a traffic stop at the 1900 block of South State Street on a 2012 Nissan Rogue bearing New York

State license plate number HBA3283.

2.      On that day, Defendant was a patrol officer for the Syracuse Police Department

("SPD") who was working alongside the Gang Violence Task Force with Officer Abraham and

Investigator Reidy to conduct "a Street Operations detail in high crime and gang areas due to a

recent spike in shots fired" calls.

3.      The driver of the Nissan Rogue activated his turn signal "just prior to making a

right turn" in violation of New York State Vehicle and Traffic Law Section 1163(b).[3]

4.      Defendant recognized the front seat passenger, Dontray Sullivan, from prior

incidents, but he had never before encountered Plaintiff, who was the driver of the Nissan Rogue

at that time.

5.      Plaintiff had picked up Mr. Sullivan (who is his cousin) on Hall Avenue in the

City of Syracuse, after which they drove to the Blue Star gas station to "grab an eighth of weed,"

---

[3]      Plaintiff disputes that he violated any vehicle and traffic laws; however, the portion of
Plaintiff's deposition testimony cited in support of the denial does not in fact contain a denial of
the asserted fact; rather, it indicates that, although Plaintiff believes the purpose of the relevant
individuals pulling his vehicle over was to harass him, he admitted that they pulled him over for
not having his "blinkers on at the stop sign."  (Dkt. No. 73, Attach. 4, at 58-59.)   Other
evidence shows that Plaintiff was charged with a violation of the above provision for failure to
signal during the 100 feet before a turn in violation of N.Y. Veh. & Traf. Law § 1163(b).  (Dkt.
No. 73, Attach. 2, at 5.)   Because Plaintiff has not cited evidence to show that he did not commit
the relevant infraction, the asserted fact is deemed to be admitted.

the purchase of which, at the time of this incident, was a violation of the New York State Penal Code.

6.      Plaintiff did not have his driver's license on him during the traffic stop; his license was suspended at that time.

7.      Plaintiff admits that his window was rolled down and that he was making reaching movements for his ID during the traffic stop when he was approached by Officer Abraham.

8.      In Defendant's training and experience, his observation that Plaintiff lifted his body while sitting in the car was "consistent with individuals attempting to conceal illegal narcotics or other evidence within their rectum from officers on the scene."

9.      Defendant discovered that Plaintiff did not possess a valid driver's license, and Plaintiff later pled guilty to the offense of driving without a valid license.

10.      Defendant and Officer Abraham "had [Plaintiff] exit the vehicle due [to] his furtive movements and to the fact that [they] were planning on towing the vehicle as there was no licensed driver on scene."

11.      Defendant smelled marijuana emanating from Plaintiff as Plaintiff exited the vehicle.

12.      The odor of marijuana caused Defendant to believe that Plaintiff possessed marijuana.

13.      Defendant "observed a clear knotted plastic baggie sticking out of [Plaintiff's] front waistband, and Plaintiff admitted at his deposition that this was where he had stored his eighth of marijuana.[4]

---

[4]      Although Plaintiff does not expressly deny this fact, he implicitly denies it by citing his

14.     Defendant collected the baggie "which contained a green/brown plant-like substance."

15.     Based on Defendant's training and experience, he knew the "substance to be consistent with marijuana."

16.     A Duquenois-Levine Reagent test kit tested positive for the presence of marijuana.

17.     The plastic sandwich bag retrieved from Plaintiff contained marijuana.

18.     Plaintiff also had "Goodsense sandwich bags" in the "pocket of his driver's door," which are commonly used for packaging drugs for sale.

19.     Officer Abraham also located "crumbs of a beige chunky substance" on the front seat of the vehicle where Plaintiff had been sitting at the time of the traffic stop.[5]

20.     The beige chunky substance tested positive for the presence of cocaine when Officer Abraham used a "NIK Cocaine Wipe" on it.[6]

---

deposition testimony in which he testified that he was searched by Officer Abraham while Defendant searched Mr. Sullivan.   (Dkt. No. 75, Attach. 1, at ¶ 14; Dkt. No. 74, Attach. 4, at 71.)   However, the fact that Officer Abraham may have searched him does not preclude the possibility that Defendant visually observed the bag, which Defendant stated was sticking out of Plaintiff's waistband.   This fact is therefore deemed to be admitted.

[5]     Although Plaintiff does not expressly deny this fact, he implicitly denies it by stating that he never had crack cocaine in his car.   (Dkt. No. 75, Attach. 1, at ¶ 20.)   However, the asserted fact does not state that the substance found was crack cocaine, and Plaintiff does not directly dispute that some sort of beige chunky substance was found in his vehicle.   The asserted fact is therefore deemed to be admitted.

[6]     Although Plaintiff does not expressly deny this fact, he implicitly denies it by stating that no test for cocaine was done in the field, citing his own deposition testimony.   (Dkt. No. 75, Attach. 1, at ¶ 21.)   However, his testimony does not support an assertion that no test of any kind was conducted at the scene.   Rather, when asked whether anything was found in the vehicle, Plaintiff answered, "No. But he said he had a positive reaction to something," and elaborated, "He couldn't test it. Whatever it was, he couldn't test it because it was going after the test supposedly."   (Dkt. No. 73, Attach. 4, at 75.)   Although Plaintiff's testimony is somewhat

21.     After the NIK test showed the presence of cocaine, Defendant placed Plaintiff into handcuffs.[7]

22.     Plaintiff was arrested at the scene of the traffic stop on the following charges: (a) Unlicensed Operation (N.Y. Veh. & Traf. L. § 509.1); (b) Aggravated Unlicensed Operation in the Third Degree (N.Y. Veh. & Traf. L. § 511[1][a]); (c) Unlawful Possession of Marijuana in the Second Degree (N.Y. Pen. L. § 221.05); and (d) Criminal Possession of a Controlled Substance in the Seventh Degree (N.Y. Pen. L § 220.03).

23.     Plaintiff also received a traffic ticket for making an insufficient turn signal (N.Y. Veh. & Traf. L. 1163[b]).

24.     Plaintiff was handcuffed and transported to the Onondaga County Justice Center ("Justice Center").

25.     Plaintiff was not struck nor was any force used upon him at the scene of his arrest.

26.     No force was used against Plaintiff while he was being transported to the Justice Center.

27.     Plaintiff was never pepper sprayed at the scene of his arrest nor while being

---

ambiguous, it clearly indicates that some sort of test was indeed performed because Plaintiff acknowledged that (1) Defendant Abraham stated that there had been a "positive reaction" to something in the car and (2) the substance "was going *after the test* . . . .".   Further, the evidence includes a photograph of the test wipe showing a blue "positive" spot on the wipe, but no beige chunky substance.   (Dkt. No. 73, Attach. 27, at 3.)   This appears to explain Plaintiff's statement that the substance "was going after the test," meaning it was dissolving after it had been wiped with the test kit, leaving no additional residue to be tested in another manner.   Under the circumstances, although the testimony is ambiguous, no reasonable person could conclude based on Plaintiff's testimony (which is largely lacking in personal knowledge of what occurred outside of his field of vision) that no test of any kind had been conducted.   This fact is therefore deemed to be admitted.

[7]     This fact is deemed to be admitted for the same reasons discussed above in Note 6 of this Decision and Order.

transported by SPD to the Justice Center.

28.     Defendant, Officer Charles Lester, and Officer Kittell rode inside the transport

vehicle with Plaintiff to have him be booked at the Justice Center.

29.     Defendant believed it was necessary to ride with Plaintiff "due to [Plaintiff's]

movements being consistent with someone attempting to secret evidence from officers within

their rectum."[8]

### Events at the Justice Center

30.     Upon arrival at the Justice Center, Plaintiff was escorted from the transport

vehicle to "the north cell," which is a fenced holding cell area in the sally port garage of the

Justice Center, and "instructed to stand up keeping his hands out of his pants."

31.     After Defendant closed the gate on the holding cell, Plaintiff put his hands toward

the back of his pants.[9]

32.     Officer Kittell, Officer Lester, Officer Abraham, and Defendant, believing

Plaintiff might have "shoved evidence into his rectum," entered the holding cell.

33.     Plaintiff, as described in Defendant's report, reached for the back of his pants

---

[8]     Although Plaintiff does not expressly deny this fact, he implicitly denies it by stating that
Defendant did not ride in the transport vehicle.   (Dkt. No. 75, Attach. 1, at ¶ 30.)   This denial is
ineffective for two reasons.   First, Plaintiff's testimony does not contradict anything about
Defendant's stated belief.   Second, Plaintiff's testimony that Defendant did not ride in the
transport vehicle (which is prefaced by his acknowledgment that "I really didn't get a good
view") is unequivocally contradicted by the video evidence from the sally port at the Justice
Center, which shows Defendant stepping out of the transport van with Plaintiff upon arrival at
the Justice Center.   (*See* Exh. V1, at 0:00:26.)   To the extent that Plaintiff has testified contrary
to what the video evidence clearly establishes, Plaintiff's testimony cannot create a *genuine*
dispute of material fact.   *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[9]     Plaintiff effectively denies the portion of the asserted fact that indicates he reached his
hands *into* the rear of his pants (and exclaimed that "it" was *inside* the rear of his pants), because,
in his deposition testimony, he stated that, although he did reach towards the back of his pants
while in the holding cell, it was only to pull his pants up.   (Dkt. No. 73, Attach. 4, at 81:19-22.)

while thrusting his hips forward, as was visible from the perspective of Defendant and Officer

Kittell moments after Plaintiff entered the holding cell.

34.     The officers on the scene "assisted in escorting [Plaintiff] to the ground" after

having entered the holding cell and attempting to force Plaintiff's hands away from his pants.[10]

35.     Plaintiff was brought to the ground, with Defendant on the left side of Plaintiff's

body.[11]

36.     While Plaintiff was being brought and held to the ground, Defendant never struck

Plaintiff and never touched Plaintiff's right hand, nor did his actions play any role in the

pre-existing fracture of Plaintiff's right hand.

37.     Defendant at all relevant times maintained control of Plaintiff's left arm and hand

while in the holding cell.

38.     Defendant never punched, kicked, or otherwise struck Plaintiff while Plaintiff was

in the holding cell, but only attempted to keep Plaintiff's left hand from the back of his pants and

to keep him on the ground until he was moved to the booking intake area.[12]

---

[10]     Plaintiff denies that there was any need for the officers to force his hands *out of* his pants,
citing to deposition testimony that he put his hands near the back of his pants only to pull them
up.   (Dkt. No. 75, Attach. 1, at ¶ 38.)   Because there is a genuine dispute as to whether
Plaintiff's hands were *inside* his pants and because the video evidence is not sufficiently clear to
establish that fact either way, the Court has amended the asserted fact to more accurately reflect
what is undisputed and what can be seen on the video evidence.

[11]     Plaintiff denies Defendant's assertion that the force used to place him on the ground was
"limited."   (Dkt. No. 75, Attach. 1, at ¶ 39.)   The Court agrees that whether the force was
"limited" is both a matter of interpretation and a legal conclusion.   That portion of the fact has
therefore been omitted.

[12]     Plaintiff does not deny this fact other than to state that there was no need to keep his
hands from his pants while he was on the ground, and cite his own deposition testimony.   (Dkt.
No. 75, Attach. 1, at ¶ 42.)   The Court finds this denial to be ineffective for each of two reasons.
First, the fact asserts nothing about a "need" to keep Plaintiff's hands from his pants but only an
"attempt[]" by Defendant to keep Plaintiff's hands from his pants.   Second, in any event, the

39.     Plaintiff claims his right hand and/or wrist were injured by the officers' actions in the sally port holding cell, but evidence shows that the fracture in that hand/wrist occurred "about 1 month prior to his original visit" to Upstate University Hospital on October 18, 2017, or approximately three-and-a-half or four weeks before his arrest on October 16, 2017.[13]

40.     Members of the Onondaga County Sheriff's Department ("Sheriff's Department") observed Plaintiff "was screaming and yelling while attempting to pull away from" SPD officers.

41.     Following the incident in the sally port holding cell, custody of Plaintiff was transferred to members of the Sheriff's Department.

42.     Sheriff's Deputy Timothy Stanton then performed a pat search of Plaintiff.

43.     At no point while Plaintiff was in booking intake with the Sheriff's Department at the Justice Center did Defendant use any force on Plaintiff or make any physical contact with Plaintiff.

44.     Defendant never verbally directed any of the employees at the Justice Center to conduct a strip search of Plaintiff.

45.     It is the policy of the Sheriff's Department's Custody Division (which operates

---

testimony to which Plaintiff cites does not support his assertion, because in that testimony he admitted that, while in the cage, he put his hands to the back of his pants when he needed to pull them up, and there is nothing in the testimony to indicate he did not need to pull his pants up after being brought to the ground.   This fact is therefore deemed to be admitted.

[13]     Plaintiff does not deny this fact other than to state that he "felt a fracture" around the area of his hand and wrist after being brought to the ground by the officers, including Defendant, and cites his own deposition testimony.   (Dkt. No. 75, Attach. 1, at ¶ 43; Dkt. No. 73, Attach. 4, at 81-82.)   The Court finds this denial to be ineffective for each of two reasons.   First, the assertion that Plaintiff "felt a fracture" does not actually controvert any portion of the above-stated fact.   Second, in any event, any assertion that Plaintiff's wrist broke during this incident (and not before it) is contradicted by the clear evidence in the record, particularly the submitted medical records.   Because no reasonable factfinder could credit Plaintiff's assertion in light of the other evidence, his testimony does not create a genuine dispute of material fact on this point.   *Scott*, 550 U.S. at 380.

the Justice Center) to conduct a strip search of every newly admitted inmate at the Justice Center

(regardless of the reason for the inmate's arrest) as part of the booking intake process in order to

check for any secreted contraband (e.g., narcotics or weapons).

46.     Pursuant to this policy, as part of the process of booking Plaintiff at the Justice

Center, Sheriff's Deputy William Pufky escorted Plaintiff to the booking shower room ("strip

search room") at approximately 1:10 P.M. to have the required strip search performed on

Plaintiff.

47.     Neither Defendant nor any other SPD officer was in the group of Sheriff's

Deputies who escorted Plaintiff to the booking shower room prior to his strip search.[14]

48.      Sheriff's Deputy Sergeant Murphy decided to leave Plaintiff handcuffed while

he was being transported to the strip search room.

49.     Before arriving at the strip search room, Deputy Pufky asked Plaintiff if he had

drugs or anything else on him that would be discovered during the search, and Plaintiff

responded "no."

---

[14]     Plaintiff denies this asserted fact, relying on his own deposition testimony.   (Dkt No. 75, Attach. 1, at ¶ 52.)   The Court finds this denial to be ineffective for each of two reasons.   First, elsewhere in his testimony, Plaintiff indicates a lack of personal knowledge of the above-stated fact: more specifically, the portion of deposition testimony relied on by Plaintiff was (1) prefaced by an acknowledgment that, while he was being taken to the strip out room, he "was incoherent," (2) followed by two acknowledgments that, while he was in that room, he was "incoheren[t]," and (3) followed by an acknowledgment that he could not remember if three officers were in the strip out room with him.   (Dkt. No. 73, Attach. 4, at 91-93.)   *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (setting forth narrow exception to rule prohibiting the rendering of credibility determinations on motion for summary judgment).   Second, in any event, the video evidence from the surveillance cameras directly and unequivocally contradicts Plaintiff's testimony.   (*See* Exh. V6, at 0:00:30-0:00:53 [showing that all of the officers escorting him down the hall to the strip search room are wearing vests emblazoned with either "Sheriff" or "S.E.R.T," with the exception of two officers, neither of whom are Defendant].)   Because the video clearly shows Defendant was not with the group that escorted Plaintiff to the strip search room, Plaintiff has not created a genuine dispute of material fact as to the asserted fact.   *Scott*, 550 U.S. at 380.

50.     Plaintiff's handcuffs were removed upon entering the strip search room.

51.     Deputy Pufky then ordered Plaintiff to remove his clothing and Plaintiff complied.

52.     Deputy Pufky "ordered [Plaintiff] to raise his arms, open his mouth, lift his scrotum and [Plaintiff] complied."

53.     Deputy Pufky then "ordered [Plaintiff] to turn around and bend at the waist while spreading his buttocks apart.   [Plaintiff] immediately placed his left arm behind his body and inserted his left hand/fingers deeply into his buttocks area."[15]

54.     Sheriff's Deputy Joseph Lee, Deputy Stanton, and Deputy John Allen also observed Plaintiff reach his hand into his buttocks.[16]

55.     According to Deputy Allen, "[t]his action, to place his hand inside his rectum, is commonly associated with the attempt to hide contraband from authorities."[17]

---

[15]     Plaintiff does not expressly deny this fact but states that he "was given orders to strip his clothes and very shortly after was beaten."   (Dkt. No. 75, Attach. 1, at ¶ 58.)   However, this not responsive to the asserted fact, and in any event the deposition testimony he cites does not support his denial.   Specifically, although he testified that it was only a short period of time between when he was asked to strip and when he was beaten and pepper sprayed, he does not say that nothing occurred between those two events.   (Dkt. No. 73, Attach. 4, at 92, 94-96.)   This fact is therefore deemed to be admitted.

[16]     Plaintiff disputes the asserted fact, citing his own deposition testimony in support of his statement that he never reached his hands into his rectum.   (Dkt. No. 75, Attach. 1, at ¶ 59.)   However, this denial is ineffective for similar reasons as were discussed above in Note 15 of this Decision and Order.   The evidence cited does not state one way or the other whether Plaintiff reached his hand into his rectum at the relevant time.   This asserted fact is therefore deemed to be admitted.

[17]     Plaintiff does not expressly deny this fact other than to state that he never reached his hand into his rectum, citing his own deposition testimony. Plaintiff's partial denial is insufficient for the reasons discussed above in Note 16 of this Decision and Order.

56.     Plaintiff "was ordered to show his hands several times and refused all orders."[18]

57.     Deputy Pufky then "grabbed [Plaintiff's] left arm in an attempt to pull his arm and hand forward, while giving numerous orders to [Plaintiff] to give [Deputy Pufky] his hand."[19]

58.     "[Plaintiff] refused all of [Deputy Pufky's] orders and continued to force his hand/fingers deeply into his buttocks area while attempting to pull away from" Deputy Pufky."[20]

59.     Deputy Pufky then dispersed two one-second bursts of his Vexor pepper spray to Plaintiff's facial area.

60.     Plaintiff continued to thrash his body and became combative.

61.     Plaintiff was then "taken to the floor" by Sheriff's Department officers and he continued to struggle and would not place his hand behind his back.

62.     Deputy Pufky was holding Plaintiff's legs because Plaintiff was attempting to kick the officers.

63.     During this struggle, Plaintiff continued to try to push his hand into his buttocks.

64.     Plaintiff "grabbed and squeezed" Deputy Stanton's left hand; when Deputy

---

[18]     Plaintiff denies this fact, but the cited evidence does not support his assertion that he was never ordered to move his hands.  (Dkt. No. 75, Attach. 1, at ¶ 61.)   When asked if he was given a command to move to his hands away from his backside, he answered, "I never heard that.  I don't recall."  (Dkt. No. 73, Attach. 4, at 96.)   The fact that Plaintiff does not recall the order being spoken or did not hear it does not contradict the testimony that it was given.  *See Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order) (noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial"); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material fact.").   This fact is deemed to be admitted.

[19]     Plaintiff's denial of this asserted fact is insufficient for the reasons discussed above in Notes 16 and 18 of this Decision and Order.

[20]     Plaintiff's denial of this asserted fact is insufficient for the reasons discussed above in Notes 16 and 18 of this Decision and Order.

Stanton ordered him to let go, he refused, and therefore Deputy Stanton struck him several times in the shoulder area with a closed fist until he released Deputy Stanton's hand.

65.     Deputy Lee gained control of Plaintiff's left wrist by pulling it and placing it behind Plaintiff's back.

66.     Defendant could hear a commotion with Plaintiff yelling.

67.     While waiting for notification as to whether Plaintiff possessed illegal contraband, Defendant, Officer Abraham, and Officer Kittell observed several Sheriff's Deputies running toward the strip search room.

68.     Defendant never entered the room where the strip search of Plaintiff was conducted at any relevant time.[21]

69.     Defendant did not pepper spray Plaintiff, nor was he in the strip search room when Deputy Pufky dispersed the pepper spray.

70.     Plaintiff passed Defendant in the hallway as he left the strip search room and was escorted by Sheriff's Deputies back to the booking intake room.

71.     In the booking intake room, Plaintiff was escorted to the eyewash station, where

---

[21]     Plaintiff disputes this asserted fact, citing his own deposition testimony that he saw Defendant in the strip search room.   (Dkt. No. 75, Attach. 1, at ¶ 77.)   The Court finds this denial to be ineffective for each of two reasons.   First, elsewhere in his testimony, Plaintiff indicates a lack of personal knowledge of the above-stated fact: more specifically, the portion of deposition testimony relied on by Plaintiff was (1) prefaced by an acknowledgment that, while he was being taken to the strip out room. he "was incoherent," (2) followed by two acknowledgments that, while he was in that room, he was "incoheren[t]," and (3) followed by an acknowledgment that he could not remember if three officers were in the strip out room with him.   (Dkt. No. 73, Attach. 4, at 91-93.)   *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Jeffreys*, 426 F.3d at 554-55.   Second, in any event, the video surveillance evidence from inside the Justice Center clearly establishes that Defendant did not enter the strip search room at any time while Plaintiff was in it; he walked to the hallway outside the door of that room while the search was occurring, but he did not open the door or enter the room.   (Exh. V6, at 0:00:33-0:04:33.) *See Scott*, 550 U.S. at 380. The asserted fact is therefore deemed to be admitted.

14

cold water was applied to his eyes and face for decontamination.

72.     After Plaintiff was decontaminated, he was transferred back to SPD custody and transported to the hospital.

73.      At no time while Plaintiff was at the Justice Center was he punched, kicked, or otherwise struck by Defendant.

74.     Plaintiff was then transported by ambulance to St. Joseph's Hospital.

**Application for and Signing of Search Warrant**

75.     While other SPD officers monitored Plaintiff at St. Joseph's Hospital, Defendant proceeded to the Special Investigation Division to complete a strip search warrant.

76.     Upon completing the search warrant and application, Defendant proceeded to the residence of Syracuse City Court Judge Rory A. McMahon (as an acting Onondaga County Court Judge) to have the warrant application and search warrant reviewed and signed.

77.     The warrant application was based on, among other things, Defendant's observations as set forth in his own sworn statement, Officer Abraham's observations, positive field tests for marijuana and cocaine, and Deputy Pufky's affidavit.

78.     The search warrant was signed by Judge McMahon on October 16, 2017.

79.     The search warrant "directed" the following:

> The person of Torrence L. Jackson, black male, [date of birth omitted] 6'03'', 240 lbs., black hair, brown eyes, to include a search of all body cavities to include the rectum/anus, as well as any areas of his clothing which are capable of concealing the narcotic controlled substance commonly known as cocaine and the illegal substance commonly known as marihuana as well as any and all illegal controlled substances, paraphernalia, weapons, moneys, compounds, mixtures, cutting agents, used in the preparation of, possession of, use of, sale of, and/or concealment of the narcotic controlled substance commonly known as cocaine and the illegal substance commonly known

as marihuana and/or illegal controlled substance and any and all item(s) (evidence) showing or tending to show preparation of, possession of, use of, sale of, and/or concealment of the narcotic controlled substance commonly known as cocaine and the illegal substance commonly known as marihuana, as well as any other illegal controlled substance(s), this being in violation of sections 220.00 and 221.00 of the New York State Penal Law.

The court further allows for medical staff of St. Joseph's Hospital to utilize any/all medicines and/or medical/surgical procedures to assist in said removal to include, but not limited to, anesthesia, IV, x-ray/sonogram and/or physical manipulation, and any and all other medical procedures determined by said medical staff to be necessary and prudent to assist in the retrieval/removal of said illicit/illegal substances (evidence) located within the anal cavity of Torrence L. Jackson.   Said medical procedures to assist in the removal/recovery of said items to be conducted by medical staff with or without the consent of Jackson.

80.     Defendant then traveled to St. Joseph's Hospital with the signed search warrant.

**Plaintiff at St. Joseph's Hospital and His Sigmoidoscopy**

81.     Defendant was not at St. Joseph's Hospital when Plaintiff arrived there at approximately 1:52 P.M.

82.     One of the reasons listed in the certified medical records for Plaintiff's visit was a "drug problem."

83.     Plaintiff was placed in the "A" section of the St. Joseph's Emergency Department, which is where agitated or psychiatric patients are typically placed.

84.     Dr. William Paolo was the attending physician assigned to the "A" section when Plaintiff arrived at St. Joseph's Hospital and he was supervising a resident doctor, Dr. Kavitha Muruganantham; Nurse Mark Manansala was the primary nurse assigned to Plaintiff.

85.     Dr. Paolo noted that Plaintiff was "agitated, combative, and stat[ed] 'I refuse

16

everything.'"[22]

86.   Police also noted that, "[u]pon arrival to the ER [Plaintiff] was very aggressive and uncooperative towards police and hospital staff."

87.   Dr. Paolo was concerned that Plaintiff was a threat to himself and others because he was combative and fighting.

88.   At 1:59 P.M., Nurse Manansala administered five milligrams of Haldol, fifty milligrams of Benadryl, and two milligrams of Ativan to Plaintiff.

89.   Neither Defendant Fiorini nor any other SPD officer administered sedatives to Plaintiff.

90.   Nurse Manansala required assistance to hold Plaintiff down while administering the sedative medication, although he does not remember who participated in restraining Plaintiff.

91.   However, Dr. Paolo did not remember any police officers restraining Plaintiff.

92.   Plaintiff never saw Defendant while he was at St. Joseph's Hospital.

93.   Neither Dr. Paolo nor Nurse Manansala was able to identify any of the SPD officers they encountered when Plaintiff was brought to the hospital.

94.   At 2:20 P.M., Nurse Manansala administered five milligrams of midazolam, an additional sedative medication.

95.   Nurse Manansala opined that crack cocaine located in an individual's rectum could be absorbed into the bloodstream.

---

[22]   Plaintiff does not expressly deny this fact, other than to assert that he was not offered any treatment and was only calling for help, citing his own deposition testimony.  (Dkt. No. 75, Attach. 1, at ¶ 121.)   However, Plaintiff testified at his deposition that, although he recalls a doctor talking to him at some point and telling him about an x-ray, he was asleep much of the time in the hospital and does not remember much of what happened there.  (Dkt. No. 73, Attach. 4, at 104-05.)   *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Genger*, 663 F. App'x at 49 n.4; *Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d at 75. This fact is therefore deemed to be

96.     At 2:32 P.M., Nurse Manansala removed the spit mask from Plaintiff's head and washed the pepper spray from his eyes.

97.     Nurse Manansala did not recall Plaintiff complaining about any distress from the pepper spray prior to his face being cleaned.

98.     Plaintiff did not make any subsequent complaints regarding the pepper spray after his face was cleaned.

99.     Dr. Paolo noted that Plaintiff's eyes exhibited no discharge and that he was in no respiratory distress.

100.     Plaintiff did not complain to Nurse Manansala about pain anywhere else on his body.

101.     Plaintiff also did not exhibit any behavior while at St. Joseph's Hospital that would indicate he sustained pain or injury to his right wrist.

102.     At 6:35 P.M., Dr. Paolo and Dr. Muruganantham ordered an x-ray of Plaintiff's abdomen.

103.     Although the x-ray did not show a "radiopaque foreign body inside of Plaintiff," Dr. Paolo stated that it would be possible that drugs would not appear on an x-ray; hospital gastroenterologist Dr. Hui Hing Tin also opined that an x-ray would only show density, not tell if there were drugs present inside of Plaintiff's body.

104.     At 7:25 P.M., Dr. Paolo turned Plaintiff's care over to Dr. Kishani Heller.

105.     After Judge McMahon signed the search warrant, Defendant returned to St. Joseph's Hospital.

106.     At some point, Dr. Heller spoke with a police officer who informed her that they

admitted.

had a court order to obtain a foreign body from Plaintiff's rectum; she was unable to recall the officer's name or their appearance.

107.    Based on the information relayed to her, Dr. Heller was concerned that there might be cocaine in Plaintiff's gastrointestinal tract.

108.    Dr. Heller requested that Plaintiff drink a laxative beverage, which he refused.

109.    Dr. Heller then requested that the charge nurse page the hospital attorney.

110.    At 9:14 P.M., Dr. Heller noted that she "[s]poke with hospital attorney Mr. Lowell Seifter, who had reviewed the court order and spoken with the judge who issued the court order and says the patient does not have the right to refuse."

111.    At 10:01 P.M., Dr. Heller informed Plaintiff of the plan to transfer him to the operating room for a sigmoidoscopy and Plaintiff became violent.[23]

112.    Dr. Heller then called for hospital police because she and her hospital staff were not capable of holding patients down to restrain them.[24]

---

[23]    Plaintiff does not expressly deny any part of this fact, and instead adds facts that fail to respond to this fact.   (Dkt. No. 75, Attach. 1, at ¶ 156.)   *See Nanos v. City of Stamford*, 609 F. Supp. 2d 260, 263 (D. Conn. 2009) ("Nanos does not actually deny the City's factual allegations, but simply adds commentary or analysis not related to the existence or non-existence of the facts alleged by the City. Such commentary or analysis is not appropriate when responding to a Local Rule Statement . . . .").   This asserted fact is therefore deemed to be admitted.

[24]    Plaintiff does not deny this fact, other than to assert that "[n]ursing staff are capable of restraining patients, and in fact do restrain plaintiff," citing to a portion of the deposition testimony from Dr. Heller.   (Dkt. No. 75, Attach. 1, at ¶ 157.)   Having reviewed Dr. Heller's cited testimony in its entirety, the Court notes that Dr. Heller appears to use the word "restrain" in two different contexts in her testimony: in one context using "restrain" to mean the physical restraint of a patient by individuals to allow medical personnel to administer sedatives or other treatments (which restraints medical personnel do *not* apply), and in another context using "restrain" to mean the application of devices that would hold a patient to the bed for longer periods of time (which restraints medical personnel *do* apply).   (*Compare* Dkt. No. 73, Attach. 18, at 34 [testifying that she called hospital police when Plaintiff became violent because "we are not capable of restraining patients, I'm not capable of it, or my nursing staff"] *with* Dkt. No. 73, Attach. 18, at 38-39 [testifying that it was one of the nurses who placed Plaintiff into the "violent

113.    At 10:04 P.M., Dr. Heller also ordered that Plaintiff be placed in "violent adult restraints" because he became "combative and verbally threatening towards staff and SPD."

114.    Nurse Shannon Phillips placed Plaintiff into restraints and monitored him in the restraints.

115.    At 10:06 P.M., an electrocardiogram of Plaintiff's heart revealed signs of tachycardia and an elevated heart rate of 128; potential causes of an elevated heart rate include agitation and ingesting drugs.

116.    Dr. Tin consulted with Dr. Heller, who informed him that "the warrant would want us to retrieve this object from the rectum with any means."

117.    At 10:30 P.M., Dr. Tin noted that he had spoken with hospital attorney, Mr. Seifter, who had stated the warrant was valid and legally advised Dr. Tin that he was "obligated to help the police under any means to retrieve the object."

118.    The decision to perform the sigmoidoscopy was made between Dr. Tin and Dr. Heller upon the legal advice of Mr. Seifter.

119.    Dr. Tin decided to perform a sigmoidoscopy because he did not know how far inside of Plaintiff the object could be or what the object was at the time of the consultation.

120.    Crack cocaine, whether in a burst package or placed unpackaged into the rectum, could be absorbed by the body; if placed inside the rectum without packaging, it could be absorbed within ten hours.

121.    Members of SPD did not direct Dr. Tin to perform the sigmoidoscopy.

122.    Dr. Tin performed the sigmoidoscopy at approximately 11:42 P.M., which is

adult restraints" ordered by Dr. Heller].)   Because Dr. Heller's testimony is not self-contradictory but successfully supports the asserted fact, that fact is deemed to have been admitted.

approximately eleven hours after Plaintiff's traffic stop at 12:34 P.M.

123.    The sigmoidoscopy procedure lasted approximately five-to-eight minutes.

124.    The sigmoidoscopy did not reveal a foreign body in the area examined.

125.    Dr. Tin did not recall seeing blood after the sigmoidoscopy.

126.    At 12:28 A.M. on October 17, 2017, Dr. Heller ordered a rapid drug screen of Plaintiff, which showed positive results for benzodiazepine, marijuana, and cocaine.

127.    Plaintiff was discharged from St. Joseph's Hospital on October 17, 2017, at 12:52 A.M.

128.    Plaintiff testified that he saw eight or nine officers at the hospital but that he did not see Defendant.

129.    Plaintiff was transported back to the Justice Center and arraigned and released on October 17, 2017.

**D.     Parties' Arguments on Defendant's Motion for Summary Judgment**

**1.      Defendant's Memorandum of Law**

Generally, in his motion for summary judgment, Defendant makes three arguments. (Dkt. No. 73, Attach. 31.)   First, Defendant argues that Plaintiff's remaining First Claim for excessive force against him (as to both the events during the traffic stop/at the Justice Center and when he was at the hospital) must be dismissed as a matter of law, because the undisputed evidence shows that Defendant did not engage in any unreasonable force, and indeed did not participate in any of the alleged force that Plaintiff claims caused his injuries.   (*Id.* at 9-24.) Specifically, Defendant argues as follows: (a) Plaintiff has admitted that no force was used at the scene of the traffic stop, or during transportation to the Justice Center; (b) the force Defendant

used on Plaintiff while Plaintiff was in the sally port holding cell when he arrived at the Justice

Center was reasonable because all he did was hold Plaintiff's torso and left arm in an effort to

keep him from reaching toward the back of his pants and to subdue him to the ground when

Plaintiff did not cooperate, and Plaintiff does not allege any injury to his left hand or arm; (c)

Defendant was not present when Plaintiff was pepper sprayed and was not in the strip search

room at all while Plaintiff was in there with Sheriff's Deputies for his search, and therefore there

is no evidence to suggest he either pepper sprayed or hit Plaintiff during that altercation; (d)

Defendant did not restrain or sedate Plaintiff while he was at the hospital, and indeed Plaintiff

acknowledges that he did not see Defendant at the hospital at any relevant time, and it is

undisputed that Defendant did not arrive at the hospital until after he had secured a warrant to

search Plaintiff; and (e) Defendant did not use any force related to the sigmoidoscopy because

that procedure was not only presumptively reasonable due to the duly executed search warrant,

but also it was performed by medical personnel under the direction of hospital legal counsel, not

by Defendant or at his specific direction.  (*Id.*)

Second, Defendant argues that, as to the remaining Second Claim regarding failure to

intervene in the events that happened during the traffic stop/at the Justice Center, there is no

admissible record evidence to show that excessive force was applied while Plaintiff was in the

sally port holding cell, and the video evidence undisputedly shows that Defendant was not

present at any time in the strip search room when Plaintiff alleges he was pepper sprayed and

beaten; and he therefore had no reasonable opportunity to intervene to the extent any of those

actions could be considered excessive force.  (*Id.* at 9-17.)

Third, Defendant argues that, even if Plaintiff can establish either of his claims,

Defendant is protected from liability as a matter of law by the doctrine of qualified immunity, because there is no case law clearly establishing that a body cavity search based on a validly executed search warrant constitutes excessive force, and based on the current record Defendant was objectively reasonable in believing his actions in subduing Plaintiff, seeking a search warrant based on the facts known to him and his own observations, and bringing the search warrant to the hospital were constitutional.   (*Id.* at 24-29.)

### 2.     Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff makes four arguments.   (Dkt. No. 75.)   First, Plaintiff argues that factual disputes preclude the entry of summary judgment on his First Claim of excessive force because, there is a genuine dispute of material fact regarding whether the initial traffic stop and following events provided sufficient suspicion that Plaintiff had drugs in his rectum, which in turn raises genuine questions regarding whether the search warrant was valid.   (*Id.* at 3-5.)   Plaintiff argues that a reasonable jury could determine that Defendant's testimony and narrative supporting the warrant is false or not credible, and therefore find that the force used against him at the hospital was unreasonable and excessive.   (*Id.*)

Second, Plaintiff argues that the video evidence should not be used as conclusive proof of any fact regarding whether Defendant was present when force was used or whether such force was reasonable, because factual disputes remain that are not resolved by the video evidence and that require submission to a jury.   (*Id.* at 5.)

Third, Plaintiff argues that the fact that his injuries may have been arguably minor in nature does not preclude an excessive force claim and that, in any event, part of his injury is that

he was subjected to an unnecessary, invasive, and humiliating medical procedure in addition to sedation.   (*Id.* at 6.)

Fourth, Plaintiff argues that Defendant is not entitled to qualified immunity because (a) a constitutional right to be free from unreasonable searches and seizures and unreasonable force is clearly established, and (b) there are genuine disputes of material fact that must be resolved before it can be determined whether his actions can be considered to be objectively reasonable. (*Id.* at 6-7.)

### 3.    Defendant's Reply Memorandum of Law

Generally, in his reply to Plaintiff's opposition, Defendant makes three arguments.   (Dkt. No. 76.)   First, Defendant argues that Plaintiff's claims for excessive force and failure to intervene during the initial traffic stop and at the Justice Center fail for the following reasons: (a) it is undisputed that no force was used during the traffic stop itself; (b) his co-occurring claim for failure to intervene during the traffic stop (about which Plaintiff has made no argument in his response) should also be dismissed given that there was no allegation of any force used; (c) Defendant's actions in the sally port holding cell at the Justice Center do not constitute excessive or unreasonable force, and the evidence substantiates a finding that Plaintiff's right wrist was not fractured during that encounter and that Defendant never touched that hand or arm or hit him; and (d) Defendant was not present in the strip search room when Plaintiff was pepper sprayed, and the video evidence substantiates a finding that he was indeed never in that room while Plaintiff was in there.   (*Id.* at 4-10.)

Second, Defendant argues that Plaintiff's claim for excessive force related to the events at the hospital also fails for the following reasons: (a) there is no evidence to substantiate that

Defendant physically restrained or medically sedated Plaintiff at the hospital; (b) Plaintiff has not provided any evidence beyond his own testimony and suppositions to support his argument that the narrative on which Defendant based the search warrant application was false, or that the search warrant it resulted in was invalid, and indeed the search warrant was based in part on marijuana, a substance Plaintiff admits had already been found during the traffic stop, and also in part on an affidavit from Deputy Pufky regarding Plaintiff's conduct in the strip search room; and (c) the sigmoidoscopy was performed not by Defendant, or at the direction of Defendant, but by medical personnel pursuant to the search warrant after consultation with counsel. (*Id.* at 10-13.)

Third, Defendant argues that he is entitled to qualified immunity, because he had a valid reason for arresting Plaintiff during the initial traffic stop, and the subsequent search warrant was based on probable cause under the undisputed facts presented. (*Id.* at 13.)

## II.   LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[25] As for the materiality requirement, a dispute of fact is "material" if "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

---

[25]   As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a), (c), (e).[26]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(a)(3).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set

---

[26]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that

statement.[27]

Similarly, in this District, where a non-movant has willfully failed to respond to a

movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed

to have "consented" to the legal arguments contained in that memorandum of law under Local

Rule 7.1(a)(3).[28]   Stated another way, when a non-movant fails to oppose a legal argument

asserted by a movant, the movant may succeed on the argument by showing that the argument

possess facial merit, which has appropriately been characterized as a "modest" burden.   *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested

therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL

2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Whether Defendant Is Entitled to Summary Judgment on Plaintiff's First Claim

---

[27]   Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[28]   *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law.   *See, supra* Parts I.D.1 and 3.   To those reasons, the Court adds the following analysis.

"The Fourth Amendment protects a free citizen from excessive force in the course of an arrest or investigatory stop."   *McDonald v. City of Troy*, 542 F. Supp. 3d 161, 168-69 (N.D.N.Y. 2021) (Hurd, J.) (citing *Cugini v. City of N. Y.*, 941 F.3d 604, 612 [2d Cir. 2019]).   "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."   *Graham v. Connor*, 490 U.S. 386, 396 (1989). "To succeed on a [Section] 1983 excessive force claim, a plaintiff must show that the defendant's use of force was 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"   *Malarczyk v. Lovgren*, 19-CV-0042, 2022 WL 374271, at *9 (N.D.N.Y. Feb. 8, 2022) (Hurd, J.) (quoting *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 491 [N.D.N.Y. 2017] [Hurd, J.]).   The objective reasonableness inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake."   *Hulett*, 253 F. Supp. 3d. at 491.

Factors the court should consider when making this assessment include "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."   *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396).   However, the court should be "careful to evaluate the record 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight[;]' . . . 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'"   *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396-97).

There are three distinct portions of the encounter on October 16, 2017, that are relevant to Plaintiff's First Claim: actions taken during the initial traffic stop, actions taken at the Justice Center, and actions taken at St. Joseph's Hospital.   With regard to the nature of the actions taken, in his Complaint, Plaintiff alleges excessive force based on (1) "[a]mong other violent acts, [he] was punched and pepper sprayed," and (2) he was "involuntarily restrained by the defendants in the hospital to facilitate the illegal colonoscopy."   (Dkt. No. 1, at ¶¶ 41-42.)

> **1.    Traffic Stop**

As to the events that occurred during the traffic stop itself, it is undisputed that Defendant did not use any force against Plaintiff.   Plaintiff alleges that, "[i]n the process of putting [him] under arrest, the defendants unnecessarily used excessive force punching and pepper spraying [him]." (Dkt. No. 1, at ¶ 15.)   However, according to Plaintiff's own deposition testimony, the alleged punching and pepper spraying did not occur until after he had arrived at the Justice Center.   Specifically, at his deposition, Plaintiff testified as follows related to the traffic stop: (1) Defendant and Officer Abraham approached his car; (2) Officer Abraham asked him for his license and registration and then "pulled" or escorted him to the back of the car and handcuffed him; (3) Officer Abraham searched his car while "officers" searched his person; (4) while Plaintiff was being searched, Defendant searched the passenger of the car; and (5) he was put into the police transport van and stated no force was used on him while he was in the van.   (Dkt. No. 73, Attach. 4, at 66-80.)   Plaintiff affirmatively stated that officers did not strike him or

pepper spray him at the scene of the traffic stop.   (*Id.* at 72, 79.)   Because even Plaintiff's own account does not indicate any force was used against him before he arrived at the Justice Center, much less that excessive force that was applied by Defendant specifically, the evidence does not support any claim of excessive force related to the events of the traffic stop.

### 2.     Justice Center

Turning to the events that occurred at the Justice Center, there are two distinct types of such events: (1) events that occurred in the sally port holding cell when Plaintiff first arrived at the Justice Center, and (2) events that occurred later when Plaintiff was taken into the strip search room to be searched for booking.

### a.     Sally Port Holding Cell

The first of these events involved an altercation in the sally port holding cell not long after Plaintiff arrived at the Justice Center.   Although there are disputed facts related to Plaintiff's actions that Defendant argues prompted the need to physically restrain him after he was placed in the holding cell (specifically whether he reached or tried to reach into his pants or into his buttocks), Plaintiff admits in his deposition testimony that, while he was in the holding cell, he put his hands toward the back of his pants in order to pull them up because, "[w]hatever type of clothing I was wearing was way below my behind."   (Dkt. No. 73, Attach. 4, at 83.) There therefore is no genuine dispute of fact that he reached towards the back of his pants at the relevant time.   He further acknowledges that it was after attempting to pull his pants up that the officers "rushed in and slammed [him] down to the ground."   (*Id.*)

The videos from the sally port cameras show Plaintiff in the holding cell, and, although the videos are not particularly clear, it can be seen that Plaintiff's hands (which are handcuffed

behind his back) do appear to be pulling on his pants in some manner; it is not apparent whether they are outside or inside of his pants.   (Exh. V1, at 0:00:53-0:01:05; Exh. V2, at 0:01:00.) While Plaintiff is doing that, Defendant and another officer enter the holding cell.   (Exh. V1, at 0:01:03; Exh. V2, at 0:01:02-0:01:05.)   The other officer appears to grab Plaintiff's hands from behind, while Defendant appears to take hold first of Plaintiff's right shoulder before quickly switching his grip to Plaintiff's left shoulder and chest; he holds Plaintiff like that while the other officer appears to be patting Plaintiff down; he also reaches around to the back of Plaintiff's left side while holding Plaintiff across the chest.   (Exh. V1, at 0:01:07-0:01:15; Exh. V2, at 0:01:10-0:01:20.)   Defendant eventually moves his hands to Plaintiff's left elbow as Plaintiff continues to visibly struggle against the officers' grip.   (Exh. V1, at 0:01:15-0:01:22; Exh. V2, at 0:01:20-0:01:25.)   Multiple other officers enter the holding cell and Plaintiff is gradually pushed toward one of the benches by the group of officers; while Plaintiff is on the bench, Defendant is seen to be holding him with one hand still near the left side of his body, although the other officers have taken a more active role at this point.   (Exh. V1, at 0:01:22-0:01:40; Exh. V2, at 0:01:25-0:01:40.)   Defendant can be seen helping to bring Plaintiff down to the ground, where Plaintiff is held by the officers.   (Exh. V1, at 0:01:40-0:02:30; Exh. V2, at 0:01:40-0:02:05.)   At no point in this video did Defendant (or any of the other officers) punch or kick Plaintiff, although one officer (not Defendant) can be seen elbowing one of Plaintiff's limbs that another officer is either holding or (if it is indeed Plaintiff's arm) being held by.   (Exh. V1, at 0:01:42-0:01:44.)   Although stating that he was struck during the altercation, Plaintiff himself was unable to recall who struck him, testifying that he was too preoccupied with "trying not to let [his] head hit the bench," and that, although he "felt something" other than "pure falling," he

was disoriented and could not answer specifically where he was struck other than to assert that his wrist was broken.  (Dkt. No. 73, Attach. 4, at 83-84.)

Setting aside the issue of whether Plaintiff's right wrist was fractured during this altercation or whether he suffered any other injuries as a result of the officers' conduct in the holding cell,[29] the video evidence from the two cameras clearly substantiates that, most relevantly, Defendant did not engage in any conduct that can be considered to be unreasonable excessive force.   His actions consisted of holding Plaintiff in place around the abdomen and left arm, attempting to pull Plaintiff's hands away from the back of his pants, and assisting the other officers in subduing Plaintiff first to the bench and then to the floor through means of gradual, controlled force without striking or hitting him.   This force was applied based on the belief that Plaintiff was reaching into the back of his pants, where Defendant has stated he believed Plaintiff might be hiding contraband based on previous observations of his behavior at the traffic stop and during transportation to the Justice Center.   (Dkt. No. 73, Attach. 2, at 6; Dkt. No. 73, Attach. 3, at 42; Dkt. No. 73, Attach. 14, at 5-6.)

Although Plaintiff offers his own testimony that he did not have contraband in his pants and did not attempt to reach into his pants at that time (but was merely attempting to pull his pants up because they were sagging), his account does not suffice to create a genuine dispute of material fact regarding whether the force used in response to his actions was excessive.   As was

---

[29]      Whether Plaintiff suffered the fracture during the altercation or weeks before his arrest does not answer the question of whether the force used was excessive, because "[t]he fact of injury alone does not render the [force] used by the officers excessive."   *Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 405 (S.D.N.Y. 2009) (finding that excessive force was not used where the plaintiff was injured in a fall after officers pushed him, because the fall itself was caused not by the push, but the fact the plaintiff slipped on water on the floor after being pushed).   As will be discussed below, even if Plaintiff's wrist was fractured in the course of the officers restraining him to the ground in the holding cell, the force they used to do so was not excessive or unreasonable under the circumstances.

already discussed, the standard for assessing whether force is excessive is not necessarily what the truth, learned after the fact, might be; it is whether the use of force was objectively reasonable from the perspective of a reasonable officer on the scene with the knowledge he or she possessed at the time. *Hulett*, 253 F. Supp. 3d. at 491; *Tracy*, 623 F.3d at 96; *Graham*, 490 U.S. at 396-97.   Defendant and the other officers had already found marijuana in Plaintiff's waistband and a small piece of a substance that tested positive for cocaine where Plaintiff was seated in the car; Plaintiff's testimony that he did not possess cocaine in the car cannot contradict the clear evidence of the NIK Cocaine Wipe, at least to the extent that the positive test result provided officers with reason to believe Plaintiff possessed cocaine at the time of his arrest. (Dkt. No. 73, Attach. 25, at ¶¶ 13-18.)   They also found plastic sandwich bags that, in Officer Abraham's experience, are known to be commonly used for packaging drugs for sale.   (Dkt. No. 73, Attach. 25, at ¶¶ 10-11.)   Further, although Plaintiff does not make any mention of shifting in his seat between the time the traffic stop occurred and when he was ordered to get out of the car, he also does not affirmatively state he did not make any such movements.   (Dkt. No. 73, Attach. 4, at 67-68.)   Defendant stated that he was in the police vehicle running Plaintiff's license when he observed Plaintiff "lift the right side of his body up off the seat causing his head to come completely out the front driver's side window," an action that Defendant interpreted as consistent with an attempt to conceal narcotics; Plaintiff did admit that his window was open at the time during the traffic stop consistent with Defendant's account.   (Dkt. No. 73, Attach. 2, at 6; Dkt. No. 73, Attach. 4, at 67-68; Dkt. No. 73, Attach. 14, at 5.)   Further, Plaintiff did not deny, and has not presented any evidence to contradict, Defendant's assertion, that, when he was placed in the holding cell, he was "instructed to stand up keeping his hands out of his pants."

(Dkt. No. 73, Attach. 2, at 6.)

Therefore, even omitting from consideration disputed facts regarding whether Plaintiff attempted to reach his hands into his pants during the ride in the transport van or whether he made a statement to the effect that "I got it in there" to officers while he was in the holding cell, there is sufficient undisputed evidence to give rise to a reasonable belief that Plaintiff might have been hiding contraband in his pants or buttocks, and evidence to suggest Defendant and other officers present believed Plaintiff was violating the order to keep his hands out of his pants. This knowledge gave rise to a reasonable need to ensure that Plaintiff did not attempt to hide that contraband further, a task which ultimately required a use of force given that the undisputed video clearly shows that Plaintiff was resisting the officers' attempts to control his arms.   The force applied by Defendant specifically, which, again, consisted primarily of holding Plaintiff's abdomen and left arm to keep him in place and his hands away from his pants and helping to bring him to the ground with the assistance of other officers when Plaintiff continued to resist, as substantiated by the video evidence, was objectively reasonable under the circumstances known to Defendant at the time the altercation occurred.   Because the undisputed facts are sufficient to show that the force used by Defendant was reasonable based upon his own observations and knowledge at the time, no reasonable factfinder could conclude that he violated Plaintiff's constitutional rights through his actions in the holding cell.

Further, to the extent that Plaintiff offers testimony regarding an improper motive for the eventual search of his rectum (namely that Defendant and Officer Abraham wished to harass him), the assessment of excessive force must be whether the force used was reasonable "'without regard to their underlying intent or motivation.'"   *Malarczyk*, 2022 WL 374271, at *9 (quoting

*Hulett*, 253 F. Supp. 3d at 491).   Because there is sufficient evidence from which Defendant and the other officers could have reasonably believed Plaintiff might be hiding contraband in his pants or buttocks at the time he was in the holding cell, the force used by Defendant to subdue Plaintiff and prevent him from reaching into his pants is objectively reasonable regardless of any potential improper motive as asserted by Plaintiff, and no reasonable factfinder could conclude otherwise based on the evidence presented.

For all of the above reasons, although Defendant undisputedly used force against Plaintiff in the holding cell at the Justice Center, no reasonable factfinder could conclude that such force was excessive under the circumstances presented.

### b.      Strip Search Room

Plaintiff also alleges that Defendant is responsible for the excessive force used on him while he was in the strip search room at the Justice Center, during which time he alleges he was physically attacked and pepper sprayed.   The incident report completed by Deputy Pufky indicates that he was in the strip search room with Plaintiff, along with Timothy Stanton and Kevin Murphy.   (Dkt. No. 73, Attach. 12, at 6-7.)   Witness statements were also submitted regarding the events in the strip search room by Kevin Robbins, Joseph Lee, and Jon Allen. (Dkt. No. 73, Attach. 12, at 9-19.)   None of these statements mentions any SPD officers (much less specifically Defendant) being in the strip search room at the relevant time.   Further, Defendant testified that he was not present when Plaintiff was being pepper sprayed.   (Dkt. No. 73, Attach. 3, at 37.)

The surveillance camera video from the hallway outside of the strip search room shows eleven individuals escorting Plaintiff to that room, all but two of whom are wearing a vest with

"Sheriff" or "S.E.R.T." on the back.   (Exh. V6, at 0:00:33-0:00:40.)   It is clear that none of the individuals is Defendant.   Approximately two minutes later, another individual can be seen rushing to the strip search room, wearing a "S.E.R.T." vest.   (Exh. V6, at 0:02:17.)   Following that individual, two persons in "Police" vests, one of whom is Defendant, and another unmarked person walk in the hallway towards the strip search room and stand outside the closed door in the hallway; none of them enters the room or opens the door.   (Exh. V6, at 0:02:20-0:03:00.) Someone inside the strip search room opens the door and the Sheriff's officers begin to exit while Defendant and the other two men continue to stand across from the door out of sight of the camera.   (Exh. V6, at 0:03:02-0:03:28.)   After a few of the Sheriff's officers have exited, someone in the hallway (it is not clear who at this point, because the camera has a view only of their legs) leans against the door to the strip search room to partially open it and look inside, stepping halfway in before exiting again to the hallway.   (Exh. V6, at 0:03:25-0:03:38.)   When that individual walks closer to the camera, it is clear he is not Defendant, who emerges into frame next to him as they walk away from the strip search room.   (Exh. V6, at 0:03:38-0:03:52.) When the door to the strip search room opens and Plaintiff is escorted out, Defendant is clearly seen further away from the door near the camera.   (Exh. V6, at 0:04:33.)   This video evidence therefore shows unequivocally that Defendant never entered the strip search room at any time while Plaintiff was inside.

Despite this clear, undisputable evidence, Plaintiff argues that the video is in fact not conclusive, citing to unspecified "factual disputes unresolved by the video evidence" and the point of law that a jury should be the one to resolve what the evidence means and which competing account to believe.   (Dkt. No. 75, at 5.)   However, the Supreme Court has

recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Indeed, in that case, the Supreme Court specifically found that the Court of Appeals erred in adopting the plaintiff's account of the facts because "it [was] so utterly discredited by" the video evidence of his dangerous driving that "it should have viewed the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380-81; *see also Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (noting that, while it is generally not the duty of a district court to weigh the credibility of the parties on a summary judgment motion, a court may disregard a version of events that is based solely on the party's own contradictory or incomplete testimony so long as there is no other evidence in the record upon which a reasonable factfinder could find in the party's favor). Because Plaintiff's unsupported assertions that he saw Defendant in the strip search room (in the context of also admitting that he was "incoherent" throughout this encounter and that he has difficulty remembering what happened because of the trauma) are blatantly contradicted by the video evidence, no reasonable factfinder could interpret the evidence in Plaintiff's favor, and, as a result, he has presented no genuine dispute of material fact regarding whether Defendant was in the strip search room, let alone that Defendant participated in the alleged use of force in that room. (Dkt. No. 73, Attach. 4, at 91-95.)

Because the video evidence clearly shows that Defendant never entered the strip search room, Plaintiff's claim that Defendant used any force against him during this incident, much less excessive force, is not supported.

### 3.      St. Joseph's Hospital

Lastly, Plaintiff alleges that he was subjected to excessive force while he was at St. Joseph's Hospital through being physically and medically restrained and through being forced to undergo a sigmoidoscopy against his will.   However, Plaintiff has not adduced admissible record evidence to raise a genuine dispute of material fact that Defendant was the person who applied any such force against him.

In his Complaint, Plaintiff alleges both that Defendant went to the police station to draft a search warrant while Plaintiff was at the hospital, and that "Defendant Fiorini returned to the hospital with the warrant around 6:36 p.m."   (Dkt. No. 1, at ¶¶ 22-23.)   There is no evidence to suggest that Defendant was at the hospital any time prior to when he arrived with the warrant. Defendant has testified that he went from the Justice Center to the station to write the warrant application and then proceeded to the home of Judge Rory McMahan to have the warrant signed. (Dkt. No. 73, Attach. 2, at 7; Dkt. No. 73, Attach. 3, at 38-39.)   Plaintiff testified that he saw "officers" in the room when they were sedating him upon his arrival at the hospital, but acknowledged that he was having difficulty seeing due to the spit mask and the after-effects of being pepper sprayed, and that his memory of being in the hospital is fuzzy due to being sedated; he affirmed that he did not specifically see Defendant, but only that he saw "about eight, nine officers."   (Dkt. No. 73, Attach. 4, at 100-04.)   Because there is no admissible record evidence from which a reasonable factfinder could conclude Defendant was at the hospital before approximately 6:30 P.M., Plaintiff has provided no basis for liability against him as to any alleged use of force that occurred before that time, including the application of physical or medical restraints.

38

As to events occurring after Defendant arrived at the hospital with the search warrant, Plaintiff testified that he had no idea who administered the sedative medications to him, or whether he had been physically held down when sedated or who restrained him.   (Dkt. No. 73, Attach. 4, at 110.)   He further did not know if Defendant was in the group of officers that were in his room when he regained awareness after the sigmoidoscopy was performed.   (*Id.* at 112-13.)

Regarding the alleged sedation and restraint, the undisputed evidence shows that sedative medications were administered by Nurse Manansala at approximately 1:59 P.M. and 2:20 P.M., which was before Defendant arrived at the hospital.   (Dkt. No. 73, Attach. 11, at 25, 26-30; Dkt. No. 73, Attach. 16, at 28, 34-35.)   The only documented instance of Plaintiff being physically restrained by persons after Defendant arrived at the hospital occurred at approximately 10:04 P.M.   (Dkt. No. 73, Attach. 11, at 23; Dkt. No. 73, Attach. 18, at 33-36.)   Progress notes from Plaintiff's hospital stay indicate that Dr. Heller was presented with the signed search warrant by "police" at approximately 7:25 P.M., after which she spoke with another doctor to consult with the hospital attorney; Dr. Heller reported that the attorney, Mr. Seifter, told her that Plaintiff did not have the right to refuse intervention within the scope of the warrant.   (Dkt. No. 73, Attach. 11, at 23.)   Dr. Heller attempted to have Plaintiff drink a cathartic,[30] which was refused, as well as to conduct a body cavity search and perform a CT of Plaintiff's abdomen, but Plaintiff refused to cooperate with those procedures; she then consulted with gastroenterology and anesthesiology and Plaintiff was sent for a sigmoidoscopy, at which point he became "violent" and "hospital police" had to be called.   (Dkt. No. 73, Attach. 11, at 23; Dkt. No. 73, Attach. 18, at 30-33.)

---

[30]      As Dr. Heller explained, a cathartic is "a liquid that is given so you can have a bowel movement."   (Dkt. No. 73, Attach. 18, at 26.)

"Violent adult restraints" were ordered by Dr. Heller and placed by Nurse Phillips.  (*Id.* at

33-34.)   Because Plaintiff himself has no memory of whether Defendant specifically restrained

him, and there is no admissible record evidence from which it can be inferred based on anything

more than speculation or chance that Defendant did so, Plaintiff has not raised a genuine dispute

of fact regarding whether Defendant used force against him in this respect at the hospital, let

alone whether any such force was excessive.

Regarding the sigmoidoscopy procedure, Defendant testified at his deposition that he did

not approach the doctors at the hospital to ask them to proceed with the sigmoidoscopy, and he

did not know who did so; he also stated that he "never asked for a [sigmoidoscopy] to be

conducted on [Plaintiff]. . . . I have never asked anyone to have a [sigmoidoscopy] conducted on

him."  (Dkt. No. 73, Attach. 3, at 50-51.)   Dr. Tin, the gastroenterologist who performed the

procedure, stated in the medical records related to the consultation that "I spoke to Mr. Seiser

[sic] (hospital lawyer) who states it's a valid warrant and we are obligated to help the police

under any means to retrieve the object."  (Dkt. No. 73, Attach. 11, at 47.)   Because there is no

admissible record evidence to suggest that Defendant did anything more than obtain the search

warrant (i.e., there is no evidence that he directed hospital personnel to perform a sigmoidoscopy

or in any way directed the course of conduct taken by hospital personnel), Plaintiff also has not

raised a genuine dispute of material fact regarding whether Defendant used force against him

related to that procedure, much less that any such force was excessive.[31]

---

[31]      This is particularly true given that the warrant itself does not direct or order the medical
staff at St. Joseph's to specifically perform a sigmoidoscopy or any similar procedure; rather it
states that they are "allowed" to use "any/all" medication or medical or surgical procedures to
assist in the removal of any marijuana or cocaine, including but not limited to "anesthesia, IV,
x-ray/sonogram and/or physical manipulation, and any and all other medical procedures
determined by said medical staff to be necessary and prudent to assist in the retrieval/removal"
of those substances.  (Dkt. No. 73, Attach. 14, at 1.)   As discussed above, the evidence shows

Plaintiff attempts to circumvent the lack of evidence by arguing that the force used, particularly at the hospital, was excessive because the warrant was based on a false narrative and false statements by Defendant.   (Dkt. No. 75, at 4-5.)   However, even if Plaintiff's argument were accepted (which it is not, given that Plaintiff has not provided any evidence to undermine the probable cause underlying the warrant, which was supported not only by Defendant's own statements, but also those of Deputy Pufky, and which permitted a search for evidence of not only cocaine but also marijuana, a substance Plaintiff had already been found to have possessed at the time of his arrest), Plaintiff's argument does not address the fact that there is no admissible record evidence to support a rational finding that Defendant ever personally and directly used force against Plaintiff.   *See Livingston v. Hoffnagle*, 19-CV-0353, 2021 WL 3888283, at *5 (N.D.N.Y. Aug. 3, 2021) (Hummel, M.J.), report-recommendation adopted by 2021 WL 3885247 (N.D.N.Y. Sharpe, J.) (noting that, to meet the requirement of direct participation underlying an excessive force claim, the use of force by the individual officer "is always an affirmative act and never passive indifference").   While the invalidity of the warrant might impact whether the force used by the hospital personnel or other persons present was excessive, it does not impute such force to Defendant, particularly given that it is undisputed that (1) Defendant did not direct hospital personnel to perform any specific actions regarding sedation or the sigmoidoscopy, (2) Defendant did not personally perform any of the medical interventions, (3) the warrant itself did not require performance of any specific measure related to the search,

---

that, although the relevant physicians were instructed by hospital counsel that they were required to comply with the warrant, it was those sources and not Defendant who determined that a sigmoidoscopy was the best method of retrieval under the circumstances.   (Dkt. No. 73, Attach. 18, at 27-33.)   Plaintiff has not offered any admissible record evidence to show that the decisions regarding which medical procedures to perform or medications to administer were made by anyone other than the medical sources at St. Joseph's Hospital.

and (4) the choices regarding what actions were to be taken were made by hospital personnel and the hospital lawyer in light of Plaintiff's agitation and refusal to submit to other, less-intrusive methods of search.   Thus, although the search warrant allowed for the hospital staff to take the actions they did, there is no admissible record evidence to suggest that Defendant asserted any control over the actions they chose to take.   As a result, the fact that Defendant secured the search warrant does not constitute a use of force against Plaintiff, and he cannot be held directly liable for the actions of others.[32]

For all of the above reasons, the Court finds that Plaintiff has not raised a genuine dispute of material fact regarding any use of excessive force against him by Defendant, and grants Defendant's motion for summary judgment on this claim.

**B.    Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Second Claim**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memoranda of law.   *See, supra* Parts I.D.1 and 3.   To those reasons, the Court adds the following analysis.

Having found that the force used by Defendant was not excessive, or that he did not directly participate in the actions Plaintiff alleges to be excessive force, the Court turns to Plaintiff's alternative argument that Defendant is nonetheless liable for failing to intervene to prevent the use of unconstitutional excessive force by others.   "A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to

---

[32]    Further, as was already discussed, Plaintiff's claim against Defendant for failure to intervene at the hospital was dismissed with prejudice on a prior motion.   (Dkt. No. 19, at 23.) He therefore cannot be held liable in this action for any asserted failure to stop hospital personnel or others from using force against Plaintiff.

prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016).   "For [a plaintiff] to succeed

on their failure to intervene claim, there must 'have been a realistic opportunity to intervene to

prevent the harm from occurring.'"   *Smith v. Sawyer*, 435 F. Supp. 3d 417, 438 (N.D.N.Y. 2020)

(Sannes, J.) (quoting *Felix v. City of New York*, 408 F. Supp. 3d 304, 312 [S.D.N.Y. 2019]).

### 1.        Traffic Stop

Because, as discussed above in Part III.A.1. of this Decision and Order, it is undisputed

that there was no force used during the traffic stop portion of the interaction on October 16,

2017, there also can be no valid claim for a failure to intervene in the use of excessive force

regarding those events.   *See Livingston*, 2021 WL 3888283, at *6 ("It is well settled that an

underlying constitutional violation is a precondition of a failure-to-intervene claim, . . . and thus

[w]here the record does not disclose an underlying excessive force violation, . . . summary

judgment on a duty to intercede claim is appropriate.")   (internal quotation marks and citations

omitted); *accord Harig v. City of Buffalo*, 22-30-cv, 2023 WL 3579367, at *5 (2d Cir. 2023).

### 2.        Justice Center

As to Plaintiff's claim regarding a failure to intervene in the events at the Justice Center,

the Court acknowledges that some force was used in both the altercation in the sally port holding

cell and the strip search room.   However, the fact that force was used does not mean that such

force was excessive, nor does it inherently mean that Defendant specifically had any reasonable

opportunity to intervene in it.   Each of these events will be discussed in turn.

### a.        Sally Port Holding Cell

For many of the reasons discussed above in Part III.A.2.a of this Decision and Order, the

force used by the officers to subdue Plaintiff in the holding cell cannot reasonably be found to be

excessive under the circumstances.   There was suspicion that Plaintiff might be hiding

contraband in his pants, and he was given an order to not reach into his pants when he was put

into the holding cell.   Plaintiff admits he reached for the back of his pants, and that such

movement triggered the officers to come into the holding cell, first only Defendant and one other

officer, and then multiple other officers joined when Plaintiff continued to resist their efforts to

get his hands away from his pants, all of which is documented in the video evidence.   The video

shows that none of the involved officers punched or kicked Plaintiff at any time, other than a

single instance of an officer hitting one of Plaintiff's limbs with his elbow.   Because there was

no obvious excessive force occurring, and because Defendant would not have been reasonably

able to preemptively stop a single blow from an officer's elbow (an action which was not

repeated), no reasonable factfinder could conclude that Defendant had any duty to intervene to

stop the conduct of the other officers in the holding cell.   *See Durr v. Slater*, 558 F. Supp. 3d 1,

at 20-21 (N.D.N.Y. 2021) (D'Agostino, J.) (finding a single kick did not constitute a use of

excessive force of significant duration to have allowed the defendant to intervene) (citing *O'Neill

v. Krzeminski*, 839 F.2d 9, 11 [2d Cir. 1988]).

### b.   Strip Search Room

Similarly, for many of the reasons discussed above in Part III.A.2.b of this Decision and

Order, putting aside (for the sake of brevity) any assessment of whether the force used by Deputy

Pufky and the other Sheriff's officers in the strip search room was excessive, there is no

admissible record evidence to reasonably suggest that Defendant had a reasonable opportunity to

intervene in the use of that force.   The video evidence clearly shows that he did not enter the

strip search room at any time while Plaintiff was inside.   Further, the video establishes that,

although Defendant was standing in the hallway directly opposite that door for a portion of the time Plaintiff was in that room, the door was closed at all times until some of the Sheriff's officers began to exit the room, after Deputy Pufky had already discharged his pepper spray. (Exh. V1, at 0:03:00-0:03:20.)   It does appear from the video that Defendant would have been able to hear Plaintiff yelling from inside the strip search room, because Plaintiff's yelling is audible even on the video from the booking circle where Defendant and others were initially waiting after Plaintiff was escorted to the strip search room; he admitted that he did indeed hear Plaintiff's yelling at that time.   (Exh. V5, at 0:02:15-0:02:45; Dkt. No. 73, Attach. 2, at 7.) However, there is no evidence to indicate that Defendant was able to see what was happening in the strip search room at the relevant time, or that he had any knowledge of what was occurring, much less any reasonable chance to intervene.   *See Rahman v. Acevedo*, 08-CV-4368, 2011 WL 6028212, at *9 (S.D.N.Y. Dec. 5, 2011) (granting summary judgment to defendant on failure-to-intervene claim where defendant "heard a commotion" from the levels below the prison mess hall but could not see what was happening or discern it from the noise, noting that "there is no evidence that she would have been able to determine from what she could hear that the officers were employing excessive force rather than appropriately restraining a disruptive inmate").   Under these circumstances, no reasonable factfinder could conclude that Defendant had any reasonable opportunity to know that what was occurring in the strip search room was unconstitutional as opposed to a normal search against which Plaintiff was resisting, much less to intervene to stop the conduct of the Sheriff's officers in that room.

For the above reasons, summary judgement is granted to Defendant on Plaintiff's remaining Second Claim.

### C.   Whether Defendant Is Entitled to the Defense of Qualified Immunity

In the alternative, the Court finds that, based on the current record, Defendant would be shielded from liability as a matter of law by the doctrine of qualified immunity, because it was objectively reasonable for him to believe his conduct at the various times did not violate any clearly established constitutional right.   As was discussed above, Defendant's undisputed actions involve (1) restraining Plaintiff and helping bring him to the ground in the holding cell at the Justice Center, (2) waiting outside of the strip search room while the Sheriff's Deputies attempted to search Plaintiff, and (3) preparing and obtaining a search warrant and bringing it to the hospital.   Based on the evidence and analysis already discussed above related to Plaintiff's substantive claims, Defendant possessed a reasonable belief regarding the constitutionality of his actions at all stages of the alleged encounter: he had a reasonable belief that Plaintiff was hiding drugs in his pants or buttocks and restrained Plaintiff in a fairly conservative manner to prevent him from being able to hide those further despite Plaintiff's continuing to struggle against officers; he was not involved in any force used on Plaintiff inside the Justice Center strip search room, and did not have the opportunity to see whether the force being used was excessive, because he was never in the room; and he prepared the search warrant based on evidence collected and both his own statements and the affidavit of Deputy Pufky, had it signed by a qualified judge, and presented it to the hospital without directing hospital staff regarding what procedures to use to comply with the warrant.

Plaintiff argues Defendant is not entitled to qualified immunity because the rights against unconstitutional searches and use of excessive force are clearly established, and because "[i]t should not be considered 'objectively reasonable' for an officer to harass a citizen under the false pretext of a traffic stop, or for an officer to present a false narrative to a magistrate in order to

obtain a warrant to unnecessarily search the citizen's body cavities."   (Dkt. No. 75, at 6-7.)
However, Plaintiff's conception of the rights involved here are far too broad despite the
well-established dictate that the right under scrutiny when determining whether qualified
immunity applies should not "be defined at a high level of generality," but should focus "on the
'specific factual situation the officers confronted.'"   *Martin v. Town of Ulster*, 21-CV-0597,
2023 WL 6977389, at \*3 (N.D.N.Y. Oct. 23, 2023) (Sharpe, J.) (quoting *McKinney v. City of
Middletown*, 49 F.4th 730, 738 [2d Cir. 2022]).   Plaintiff has not offered any argument as to
whether there was a clearly established constitutional right to be free from the actions taken in
the specific circumstances that occurred here.   Nor does the Court see any precedent which
makes it "sufficiently clear that every reasonable official would have understood that what he is
doing violates that right" or which has "placed the statutory or constitutional question beyond
debate."   *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *Mullenix v. Luna*, 577 U.S.
7, 11 [2015]; *White v. Pauly*, 580 U.S. 73, 78 [2017]).

Further, Plaintiff's characterization of the nature of Defendant's conduct is based purely
on speculation because, even with the disputed issues of fact that remain, there is no evidence
beyond Plaintiff's unsubstantiated claims that Defendant wanted to harass him or falsified the
statements in the search warrant application to support a finding that either the traffic stop or the
search warrant were not valid.   The evidence instead shows that Plaintiff was charged with the
relevant traffic infraction for which Defendant states he was stopped, he was arrested for driving
without a license and possessing marijuana (both of which he has admitted to doing), and the
warrant was based not only on Defendant's statements, but also in part on the statements of
Deputy Pufky that Plaintiff continued to engage in behaviors that raised suspicion he was hiding

drugs in his rectum while deputies attempted to search him at the Justice Center, as well as the fact that officers had already found him in possession of marijuana and at least a small amount of cocaine during the traffic stop.   Thus, regardless of the issues of fact that remain, there has been no admissible record evidence presented to raise a genuine dispute regarding either the validity of Plaintiff's arrest or the search warrant.   Plaintiff's speculative assertions do not suffice to show that Defendant's conduct was objectively unreasonable.

For the above reasons, the Court finds that, in the alternative to a substantive resolution of Plaintiff's claims on the merits, Defendant is entitled to summary judgment based on the affirmative defense of qualified immunity.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 73) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**.

Dated:   March 5, 2024
           Syracuse, New York

Glenn T. Suddaby
U.S. District Judge

48